IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Tara Murtha | : | |
| 1617 John F. Kennedy Boulevard | : | |
| Suite 1130 | : | |
| Philadelphia, PA 19103, | : | |
| | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | No. |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **Review Publishing Limited Partnership** | : | |
| **d/b/a Philadelphia Weekly** | : | |
| **1500 Sansom Street, 3rd Floor** | : | |
| **Philadelphia, PA 19102** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Sural Corporation** | : | |
| **One Belmont Avenue** | : | |
| **Bala Cynwyd, PA 19004** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Anthony and Catherine Clifton,** | : | |
| **aka Catherine Roberts, H/W,** | : | |
| **d/b/a Philadelphia Weekly** | : | |
| **1500 Sansom Street, 3rd Floor** | : | |
| **Philadelphia, PA 19102** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT
### Jurisdiction and Venue

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 2201, 2202, 1331(a), 1343 and 42 U.S.C. § 2000e-5(f). The described remedies are sought pursuant to 42 U.S.C. §§ 2000e-5, 1981a, and 1988, and 28 U.S.C. §§ 2201, 2202, 1331(a) and 1343.

2.     Plaintiff has complied with all jurisdictional prerequisites, including those set forth in 42 U.S.C. § 2000e-5.

3.     All Defendants maintain their principal offices in the Eastern District of
Pennsylvania, and more specifically, in the Commonwealth of Pennsylvania, at 1500
Sansom Street, 3rd Floor, Philadelphia, PA 19102 or One Belmont Avenue, Bala
Cynwyd, PA 19004. Furthermore, the alleged unlawful acts and practices of the
Defendants were committed within or upon the direction of Defendants' agents within the
Commonwealth of Pennsylvania.

## Parties

4.     Plaintiff Tara Murtha is a senior writer for Philadelphia Weekly, and is an adult
individual and a citizen of the Commonwealth of Pennsylvania, residing in Philadelphia,
and can be served with process at the aforementioned address which is the office of her
undersigned counsel. At any and all times relevant, Plaintiff has been and remains one of
the most important and respected investigative journalists in the United States, and
certainly in the City of Philadelphia.

5.     Defendant Review Publishing (hereinafter "Review Publishing") is a
Pennsylvania limited partnership with a principal place of business located at 1500
Sansom Street, 3rd Floor, Philadelphia, PA 19102 (and therefore a Pennsylvania citizen),
and upon information and belief, is registered to do business in the state of Pennsylvania,
and publishes and owns the newspaper Philadelphia Weekly, located at the same address.
Defendant Review Publishing also has an address, registered with the Pennsylvania
Department of State, at 1209 Orange Street, Wilmington, PA 19801. *See* Business Name
History, attached hereto and incorporated herein as Exhibit A.

6.     Defendant Review Publishing is in the business of owning and operating
newspapers in Philadelphia and New Jersey. Upon information and belief, Defendant
Review Publishing employs in excess of 20 employees.

7.     Defendant Review Publishing is an "employer" within the meaning of 42 U.S.C. §
2000e(b).

8.     Defendant Sural Corporation is a Delaware corporation, and registered with the
Pennsylvania Department of State to conduct business at One Belmont Avenue, Bala
Cynwyd, PA 19004 (and is therefore a Pennsylvania citizen). *See* Business Name
History, attached hereto and incorporated herein as Exhibit B.

9.     Upon information and belief, Defendant Sural Corporation is the general partner
of Defendant Review Publishing, and is registered as such with the Pennsylvania
Department of State. *See* Exhibit A.

10.    Accordingly, as general partner of Defendant Review Publishing, Defendant Sural
Corporation is in the business of owning and operating newspapers in Philadelphia and
New Jersey, including but not limited to the Philadelphia Weekly. Upon information and
belief, Defendant Sural Corporation accordingly employs in excess of 20 employees.

11.     Defendant Sural Corporation is therefore an "employer" within the meaning of 42 U.S.C. § 2000e(b).

12.     Defendants Anthony and Catherine Clifton, a/k/a Catherine Roberts, H/W, are adult individuals and citizens of the Commonwealth of Pennsylvania, regularly conducting business at 1500 Sansom Street, 3rd Floor, Philadelphia, PA 19102 (hereinafter "the Clifton Defendants").

13.     Defendant Review Publishing is owned, operated, and solely controlled by Defendants Anthony and Catherine Clifton, a/k/a Catherine Roberts, H/W, according to an explicit admission in that regard by Defendant Anthony Clifton himself. *See* City Paper story, a true and correct copy of which is attached hereto and incorporated herein as Exhibit C.

14.     Furthermore, neither of the Clifton Defendants are identified as "limited partners" on Defendant Review Publishing's registration with the Pennsylvania Department of State. *See* Exhibit A.

15.     Therefore, it is averred and believed that the Clifton Defendants are also general partners and/or managing partners and/or controlling partners of Defendant Review Publishing, L.P., and are thereby in the business of owning and operating newspapers in Philadelphia and New Jersey, including but not limited to the Philadelphia Weekly. Upon information and belief, the Clifton Defendants accordingly employ in excess of 20 employees.

16.     In addition and/or the alternative, it is averred and believed that if the Clifton Defendants are limited partners, that they (individually and/or collectively) took part in the control of the business conducted by Defendant Review Publishing, L.P. to such an extent that they are, in fact and at law, general partners.

17.     Accordingly, therefore, the Clifton Defendants are, individually and collectively, an "employer" within the meaning of 42 U.S.C. § 2000e(b).


## Facts

18.     In or around March of 2008, Defendant Review Publishing hired Plaintiff as the arts editor of the Philadelphia Weekly.

19.     In or around October of 2008, Defendant Review Publishing transferred Plaintiff to the position of staff writer, and gave her a salary of approximately $40,000 per year.

20.     In or around August of 2009, Defendant engaged in a series of financial cutbacks. As part of these cutbacks, Defendant instituted a five percent decrease in pay upon the

Plaintiff. *See* George Troyano memo, attached hereto and incorporated herein as Exhibit D.

21.     The five percent pay decrease lowered Plaintiff's yearly salary from approximately $40,000 to approximately $38,000.

22.     From the time she was hired until the present day, Plaintiff has been alienated and/or subject to noxious discrimination by specific co-workers, supervisors, and/or Defendant Review Publishing's owners and management, all of whom fostered and encouraged a male-dominated, sexist and chauvinistic atmosphere at the Philadelphia Weekly's office.

23.     For example, on several occasions, Plaintiff—and, upon information and belief, other female employees of Defendant Review Publishing—complained to management (including but not limited to office supervisor Ginger Monte, COO John Gallo, and/or Defendant Anthony Clifton) about the office cubicle of a male employee, Retail Account Executive David Muir, which was decorated with multiple pictures of naked and/or scantily clad women, torn from the pages of pornographic magazines and/or websites.

24.     No action was ever taken to address the gratuitous display of Muir's onanistic aspirations because, upon information and belief, Muir generated a lot of advertising revenue for Defendant Review Publishing.

25.     By contrast, when Plaintiff attempted to set up a charitable food drive in the Philadelphia Weekly break room, she was told by the office supervisor, Ginger Monte, that such conduct violated company policy.

26.     In another instance, Plaintiff was denied an application to have her gas money reimbursed for travelling from Philadelphia to West Chester to cover a story about abortion, despite the fact that a male employee (J. Cooper Robb) had recently been granted a similar reimbursement request to travel within Philadelphia for a theatre review.

27.     On another occasion, Plaintiff complained about excessive noise by male co-workers while she was trying to conduct a telephone interview with a Pennsylvania state senator.  Rather than correct the frat house atmosphere of the office, office supervisor Ginger Monte told the Plaintiff to "go find an empty room and close the door."

28.     In the midst of the aforementioned hostile and sexually discriminatory work environment, Defendant then hired a second staff writer in the summer of 2011. The new employee, a man named Michael Alan Goldberg ("Goldberg"), had the same job description, responsibilities, expectations, and job title as Plaintiff.  However, he was given a salary of $40,000 per year.

29.     Though Goldberg was paid $40,000 per year, Plaintiff continued to be paid $38,000 per year.

30.     At the time of Goldberg's hire, and throughout Goldberg's tenure at the paper, Plaintiff was unaware of the disparity in pay, which unjustly and unlawfully continued despite Plaintiff's comparatively superlative academic and professional credentials.

31.     Upon information and belief, the editor-in-chief of Philadelphia Weekly at the time of Goldberg's hire, a woman named Adamma Ince ("Ince"), subsequently campaigned for a year following Goldberg's hire to restore Plaintiff's pay to $40,000 per year, equal to both Plaintiff's original salary and that which was being paid to Goldberg at the time.

32.     Plaintiff's salary was never restored, despite Adamma Ince's efforts in that regard.

33.     In late February or early March 2012, Ince left Philadelphia Weekly. Shortly thereafter, Ince informed the Plaintiff of the discrepancy in pay between her and Goldberg, and Ince's unsuccessful attempts to correct the inequity.

34.     Goldberg was eventually dismissed from Philadelphia Weekly for inadequate performance. At the time of his dismissal, he still earned $2,000 more per year than the Plaintiff.

35.     While Plaintiff had been given the title of "Senior Writer" by the time of Goldberg's dismissal, Goldberg nonetheless made $2,000 more per year than the Plaintiff, despite his subordinate position of "Staff Writer," to say nothing of whatever circumstance(s) warranted his dismissal.

36.     By the time of Goldberg's dismissal, Plaintiff was far more academically credentialed, having earned a master's degree in English and Publishing from Rosemont in 2010.  Plaintiff was nonetheless paid less than Goldberg, as aforementioned

37.     At any and all times relevant, Plaintiff enjoyed more industry awards and accomplishments than Goldberg, including but not limited to:

    A)  A position as a professor of journalism at Temple University;

    B)  two (2) Distinguished Writer awards from the Pennsylvania Newspaper Association, two years in a row;

    C)  numerous other awards from the Society of Professional Journalists and the Pennsylvania Newspaper Association;

    D)  a fellowship with the Dart Center for Journalism and Trauma at Columbia University's School of Journalism; and,

    E)  Great reviews from supervisors at the Philadelphia Weekly, while Goldberg was reviewed poorly and eventually dismissed.

38.     Plaintiff herself has asked for restoration of her salary on at least two occasions, of both Defendant Anthony Clifton and COO John Gallo, only to be denied every time.

39.     Despite her requests for proper remuneration and despite her superlative credentials, Defendant Anthony Clifton has instead opted for hollow praise, telling Plaintiff that she was "a great reporter. You always touch a national nerve with your stories and thereby always get picked up by AAN. You have a bright future that definitely includes a Pulitzer. It's been a great pleasure working with you." *See* 2/9/12 email from Clifton, a true and correct copy of which is attached hereto and incorporated herein as Exhibit E.

40.     Defendants refused to restore Plaintiff's salary, despite Defendant Anthony Clifton's admission that the newspaper had a "really large and growing audience." *See* Liz Spikol interview with Anthony Clifton, attached hereto and incorporated herein as Exhibit F.

41.     As of the date of this filing, Plaintiff is still being paid a salary of $38,000 per year.

42.     Plaintiff avers that Defendants' decision to hire a male employee (Goldberg) for the same job at a higher salary than her own was based upon her sex.

43.     In addition, Plaintiff avers that Defendants' refusal to raise her salary to match that of her male counterpart was based on her sex.

44.     Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission on or about February 12, 2013 (at EEOC Charge No. 530-2013-01359), and the EEOC subsequently issued a "right to sue" letter on or about June 25, 2013. *See* "right to sue" letter, a true and correct copy of which is attached hereto and incorporated herein as Exhibit G.

## PLAINTIFF v. DEFENDANTS
## COUNT I
## VIOLATION OF THE EQUAL PAY ACT – 29 U.S.C. § 206

45.     Averments 1 through 44 are incorporated as though fully set forth herein at length.

46.     Defendants employed both Plaintiff and a male employee (Goldberg) as staff writers for Philadelphia Weekly. Their job titles were identical and each employee was required to exhibit equal skill, effort and responsibility.

6

47.     Both Plaintiff and the male staff writer performed their jobs under similar working conditions, specifically in the newsroom of Philadelphia Weekly and in and about the Philadelphia area. Both faced similar deadlines and writing expectations.

48.     Despite their similar job title, requirements and working conditions, Plaintiff was paid $2,000 less per year than the male staff writer for doing substantially equal work.

49.     Defendants have intentionally, willfully, and/or with reckless indifference to federal law, compensated Plaintiff at a wage rate substantially less than that paid to a male employee performing work in the same job, the performance of which requires equal skill, effort, and responsibility, in violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1).

        WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor and against Defendants, jointly and severally, in an amount in excess of $150,000 (One Hundred Fifty Thousand Dollars), as follows:

(a) Declaratory judgment in the nature of an order declaring that the actions of Defendants violate the Equal Pay Act;

(b) Injunctive relief, enjoining Defendants from further such violations;

(c) Liquidated damages under the Equal Pay Act and back pay with interest;

(d) Compensatory and punitive damages in an amount to be determined at trial, together with interest, costs and fees, including expert witness fees pursuant to 42 USC § 1988;

(e) Attorney's fees; and

(f) Such other relief as this Honorable Court deems appropriate.

## PLAINTIFF v. DEFENDANTS
## COUNT II
## VIOLATION OF TITLE VII OF
## THE CIVIL RIGHTS ACT OF 1964 – 42 U.S.C. § 2000e-2

50.     Averments 1 through 49 are incorporated as though fully set forth herein at length.

51.     As a female employee, Plaintiff belongs to a protected class upon which it is illegal for Defendants to discriminate with regard to her compensation, terms, conditions, or privileges of employment.

52.     Despite Plaintiff's superior qualifications and excellent track record as a staff writer for Philadelphia Weekly, Defendants paid a male employee a higher salary than

Plaintiff to perform the same job. Plaintiff therefore suffered an adverse consequence to her employment as a direct result of her gender.

53.     This inequity in compensation is just one of several factors that clearly indicate the discriminatory nature in which Defendants treated Plaintiff because of her gender, as is more fully set forth above.

54.     Even after the disparity in pay was brought to Defendants' attention, no attempt was made by anyone with decision-making power within the organization to raise Plaintiff's salary to a level equal to that of her male counterpart.

55.     Defendants have engaged in unlawful practices in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), by discriminating on the basis of gender in their employment practices, including but not limited to paying Plaintiff less than another staff writer solely on the basis of her sex.

56.     Defendants were also in violation of Title VII because they were negligent in failing to rectify the sexually intimidating, hostile and/or offensive work environment at Philadelphia Weekly, examples of which include but are not limited to permitting David Muir to have his proud displays of pornography while disallowing Plaintiff's charitable food drive efforts, and providing gas money for in-town theater reviews by a male writer while denying Plaintiff gas money to cover an abortion story in West Chester.

57.     Indeed, not only did the Defendants fail to force Muir to remove his pornography for a grossly protracted period of time, they actually fostered and encouraged the same by allowing office supervisor Ginger Monte to dismiss Plaintiff's complaints in that regard as coming from Plaintiff's "big mouth," thus fostering and encouraging a sexually intimidating, hostile and/or offensive work environment.

58.     Plaintiff's attempts at a charitable food drive, as well her requests for gas money reimbursement, were similarly and summarily dismissed, further fostering and encouraging a sexually intimidating, hostile and/or offensive work environment.

59.     Indeed, the Defendants fostered and encouraged a sexually hostile work environment through the aforementioned pay disparity, pornography displays, and their miserly refusal of Plaintiff's gas money reimbursements and food drive attempts, and in so doing violated Defendants' own policies on Equal Employment Opportunity, Harassment, and Expense Reimbursements, true and correct copies of which are attached hereto and incorporated herein as Exhibit H.

        WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor and against Defendants, jointly and severally, in an amount in excess of $150,000 (One Hundred Fifty Thousand Dollars), as follows:

(a) Declaratory judgment in the nature of an order declaring that the actions of

Defendants violate Title VII of the Civil Rights Act of 1964;

(b) Injunctive relief, enjoining Defendants from further such violations;

(c) Compensatory and punitive damages in an amount to be determined at trial, together with interest, costs and fees, including expert witness fees pursuant to 42 USC § 1988;

(d) Attorney's fees; and

(e) Such other relief as this Honorable Court deems appropriate.

**PLAINTIFF v. DEFENDANTS**
**COUNT III**
**VIOLATION OF THE PENNSYLVANIA**
**HUMAN RELATIONS ACT– 43 P.S. § 955 et seq.**

60.     Averments 1 through 59 are incorporated as though fully set forth herein at length.

61.     As a female employee, Plaintiff belongs to a protected class upon which it is illegal for Defendants to discriminate with regard to her compensation, terms, conditions, or privileges of employment.

62.     Despite Plaintiff's superior qualifications and excellent track record as a staff writer, Defendants paid a male employee a higher salary than Plaintiff to perform the same job. Plaintiff therefore suffered an adverse consequence to her employment as a direct result of her gender.

63.     This inequity in compensation is just one of several factors that clearly indicate the discriminatory nature in which Defendants treated Plaintiff because of her gender, as is more fully set forth above.

64.     Even after the disparity in pay was brought to Defendants' attention, no attempt was made by anyone with decision-making power within the organization to raise Plaintiff's salary to a level equal to that of her male counterpart.

65.     Defendants have engaged in unlawful practices in violation of the Pennsylvania Human Relations Act, 43 P.S. § 955, by discriminating on the basis of gender in their employment practices, including but not limited to paying Plaintiff less than another staff writer solely on the basis of her sex.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor and against Defendants, jointly and severally, in an amount in excess of $150,000 (One Hundred Fifty Thousand Dollars), as follows:

(a) Declaratory judgment in the nature of an order declaring that the actions of Defendants violate the Pennsylvania Human Relations Act;

(b) Injunctive relief, enjoining Defendants from further such violations;

(c) Compensatory and punitive damages in an amount to be determined at trial, together with interest, costs and fees, including expert witness fees pursuant to 42 USC § 1988;

(d) Attorney's fees; and

(e) Such other relief as this Honorable Court deems appropriate.

## DEMAND FOR JURY TRIAL

Trial by a jury of twelve (12) persons is demanded as to all issues.

Respectfully Submitted,

Date:  July 31, 2013

J. Conor Corcoran, Esquire
Atty. I.D. No. 89111
1617 John F. Kennedy Boulevard
Suite 1130
Philadelphia, PA 19103
Phone: (215) 977-9300
Fax: (215) 864-0188

# EXHIBIT A



# Corporations

Online Services | Corporations | Forms | Contact Corporations | Business Services

Search
By Business Name
By Business Entity ID
Verify
Verify Certification
Online Orders
Register for Online
Orders
Order Good Standing
Order Certified Documents
Order Business List
My Images
Search for Images

**Date: 7/30/2013**

## Business Entity
## Filing History
(Select the link above to
view the Business Entity's
Filing History)

## Business Name History

| Name | Name Type |
| --- | --- |
| REVIEW PUBLISHING LIMITED PARTNERSHIP | Current Name |

## Limited Partnership - Domestic - Information

| | |
| --- | --- |
| **Entity Number:** | 956262 |
| **Status:** | Active |
| **Entity Creation Date:** | 12/31/1986 |
| **State of Business.:** | PA |
| **Registered Office Address:** | 1209 ORANGE STREET WILMINGTON PA 19801-0 |
| **Mailing Address:** | No Address |

## Partners

| | |
| --- | --- |
| **Name:** | SURAL CORPORATION |
| **Title:** | General Partner |
| **Address:** | [Address Not Available] PA |

Copyright © 2002 Pennsylvania Department of State. All Rights Reserved.
Privacy Policy | Security Policy

# EXHIBIT B



# Corporations

Online Services | Corporations | Forms | Contact Corporations | Business Services

Search
By Business Name
By Business Entity ID
Verify
Verify Certification
Online Orders
Register for Online
Orders
Order Good Standing
Order Certified Documents
Order Business List
My Images
Search for Images

## Business Entity
## Filing History

Date: 7/30/2013    (Select the link above to
view the Business Entity's
Filing History)

## Business Name History

| Name | Name Type |
| --- | --- |
| SURAL CORPORATION | Current Name |

## Business Corporation - Foreign - Information

| | |
| --- | --- |
| **Entity Number:** | 967777 |
| **Status:** | Active |
| **Entity Creation Date:** | 3/11/1987 |
| **State of Business.:** | DE |
| **Registered Office Address:** | ONE BELMONT AVENUE BALA CYNWYD PA 19004-0 Montgomery |
| **Mailing Address:** | No Address |

## Officers

| | |
| --- | --- |
| **Name:** | **RALPH J ROBERTS** |
| **Title:** | **President** |
| **Address:** | PO BOX 8985 WILMINGTON DE 19899 |

| | |
| --- | --- |
| **Name:** | **JULIAN A BRODSKY** |
| **Title:** | **Treasurer** |
| **Address:** | PO BOX 8985 WILMINGTON DE 19899 |

Copyright © 2002 Pennsylvania Department of State. All Rights Reserved.
Privacy Policy | Security Policy

# EXHIBIT C



print without images

# The Weekly in Review

## by Kevin Haney

Published: April 10, 2007

**A**FTER 20 YEARS OF RUNNING *PHILADELPHIA WEEKLY*, WITH NEWSPAPERS EVERYWHERE LOSING readers to digital competitors, Anthony Clifton is looking for an alternative to owning it. Using a New York City investment bank, Clifton in mid-March began looking for someone to buy the alternative weekly's parent company, Review Publishing. (His firm also publishes the *Atlantic City Weekly* and two neighborhood weeklies under the *South Philadelphia Review* banner.)

The bean-counting sorts in the media biz guesstimate PW's sale value at $10 million or a tad above, with the four pubs together probably worth about $15 million. Clifton didn't return calls last week seeking comment, but a New York investment bank, Jordan, Edmiston Group, began contacting prospective buyers about three weeks ago, media types said.

David Lipson, president of *Philadelphia* magazine, acknowledged that he looked at the paper's financials, but passed on any deal. He said a nondisclosure agreement prevented him from commenting further.

Others said to be interested buyers included Brian Tierney and his partners, who last year bought the *Inquirer* and *Daily News*, and Village Voice Media (VVM), the Phoenix-based chain that purchased New York's venerable *Village Voice* last year.

With a total of 17 papers and 1.8 million weekly circulation, the chain once known as New Times Media changed its name to VVM in homage its New York-based flagship. Tierney isn't talking about his possible interest, a spokeswoman said last week. (Also, a story posted on the Weekly's Web site last week debunked a blog posting indicating that the Weekly had already been sold to VVM, and noted that Richard L. Connor, editor and publisher of the Times Leader in Wilkes-Barre, is also in the bidding mix.)

The paper — the staff is said to be on edge as they await any sort of word about the purportedly looming sale, which has not been openly addressed in their offices — publishes more than 101,000 copies each week while its Atlantic City cousin puts more than 40,000 copies out on shore streets. The Weekly began life in 1971 as the Welcomat, aimed strictly at Center City.



Clifton, 60, an Englishman married to a daughter of Comcast honcho Ralph Roberts, bought Review Publishing in 1987, leaving a finance job at the cable conglomerate. He and wife Catherine are the papers' sole owners, he said in a 2005 interview. Welcomat officially morphed to alternative status in 1994 as *Philadelphia Weekly*, competing with *City Paper*, which dates back to 1981.



Alt-weeklies have almost been a sure bet nationwide since the *Village Voice* pioneered the genre some 50 years ago, but are now coming up against a wall, especially in big cities. Like the big dailies, the alts have faced stiff competition from Internet sites in the last five years, says Richard Karpel, executive director of the Association of Alternative Newsweeklies. Online classifieds such as Craigslist have cut into the hip metro weeklies' base of classified advertisers, especially when it comes to personal listings, he explained.

© Philadelphia City Paper

# EXHIBIT D

**Review Publishing**

# Memo

**To:** Staff

**From:** George Troyano

**CC:** Ginger Monte

**Date:** 7/28/2009

**Re:** Payroll Modifications

---

As promised, this memo serves to detail planned compensation modifications scheduled for August 3, 2009. I want to again thank everyone for their support and candor during last week's operational announcement in regards to the corrective steps that are required to better solidify the collective future of the organization.

It is management's intent to limit the duration of the payroll modifications as we sincerely understand the personal impact of these moves. Performance will be monitored closely over the next several months, with formal assessment performed year end. Although economic trending remains unforgiving, some indicators point to improving conditions later this fall. Senior management will continue to make the appropriate investments necessary to best position this organization for long term growth inclusive of further supporting the industry's evolution into digital technology. Your dedication, commitment, and loyalty to the operation sets Review apart from the competition and better supports our ability to navigate through these challenging times.

**Payroll Reductions**

- Pay reductions to take affect August 3, 2009, first appearing in paychecks August 20th for work performed 8/3 through 8/14.

**Furloughs**

- Employees required to take furlough time must take 6 furlough days prior to year end. It is recommended that furlough time be taken as follows; *one day* in each of the following months; August, September, October, and November, and *two days* in December.

- Time can be taken in half day increments to spread financial impact throughout the course of the month (i.e. ½ day first pay period of the month and ½ day in the second pay period).

- Furlough time must be planned with your direct manager to ensure department workflow will not be compromised.

1

- Employees may request taking furlough in blocks of days rather than the recommended 1 per month (or 2 in December). That is acceptable providing time off is approved by employee's manager. Keep in mind, blocking days together will have a more dramatic impact on employee's paycheck for that pay period.

- Employees who are required to fill out a time sheet should mark the day taken as a furlough.

- Managers who report time off to payroll must report time taken as a furlough on the absentee report so that the payroll department can track appropriately.

- Furlough time will not impact the accrual of vacation time.


As you all know, as part of this process, management also had to make some very tough decisions relative to the consolidation of positions. This was by no means a reflection on the individuals performing those tasks. Their contributions over the years were invaluable and helped to support the success of the operation.

In summary, it goes without saying, that I will be expecting everyone to positively support one another to best compensate for leaner resources. Our ability to effectively work as a team especially during these challenging times is vitally essential for future stability and growth. If you should have any additional questions, feel free to stop by to talk to either Ginger or me.

George
JPT

# EXHIBIT E

**Subject:** Fwd: FW: Church v. State

**From:** Tara Murtha (⬛⬛⬛⬛⬛⬛.com)

**To:** conorcorcoran@yahoo.com;

**Date:** Wednesday, May 2, 2012 8:26 PM

Below: Anthony Clifton compliments a cover story of mine that once again was featured as a "top story" on alt weeklies.com, and my editor Adamma's confidence in my ability as a reporter.

---------- Forwarded message ----------
From: **Tara Murtha** <tmurtha@philadelphiaweekly.com>
Date: Wed, May 2, 2012 at 8:21 PM
Subject: Fwd: FW: Church v. State
To: ⬛⬛⬛⬛⬛⬛.com

--- the forwarded message follows ---

---------- Forwarded message ----------
From: "Adamma Ince" <aince@philadelphiaweekly.com>
To: "Anthony Clifton" <aclifton@reviewpublishing.com>, <tmurtha@philadelphiaweekly.com>
Cc: "'John Gallo'" <jgallo@southphillyreview.com>
Date: Thu, 09 Feb 2012 10:35:05 -0500
Subject: Re: FW: Church v. State
I second that. Tara, you're a great reporter. You always touch a national nerve with your stories and thereby always get picked up by AAN. You have a bright future that definitely includes a Pulitzer. It's been a great pleasure working with you.

On Thu, 9 Feb 2012 10:24:13 -0500
"Anthony Clifton" <aclifton@reviewpublishing.com> wrote:
.nice too to see your piece at the top of the AAN website tdoday!

Anthony A. Clifton Chairman and CEO Review Publishing 1500 Sansom St. Philadelphia PA 19102
Tel: 215-563-7400 x 108
Review Publishing reaches over 600,000 readers every week through
PW-Philadelphia Weekly, the South Philly Review and Atlantic City Weekly, as
well as through its web sites and specialty publications.
_____
From: Anthony Clifton [mailto:aclifton@reviewpublishing.com] Sent: Thursday, February 09, 2012
10:18 AM
To: 'tmurtha@philadelphiaweekly.com'

Cc: 'Adamma Ince'; 'John Gallo'
Subject: Church v. State

I really appreciated your thoughtful piece on the SOL issue this week and I
particularly responded to the 'teaser' headline on the web site that drew
this reader in by asking, in effect, why on earth would the Catholic Church
oppose removal of SOL in the first place? (The answer seems to be, "meet
secular needs first, then spiritual").

Thank you for this thoughtful and well written contribution to the SOL
debate.

Anthony A. Clifton Chairman and CEO Review Publishing 1500 Sansom St. Philadelphia PA 19102
Tel: 215-563-7400 x 108
Review Publishing reaches over 600,000 readers every week through
PW-Philadelphia Weekly, the South Philly Review and Atlantic City Weekly, as
well as through its web sites and specialty publications.

EXHIBIT F



C🖶 PRINT THIS

Powered by  Limelight

# Anthony Clifton Talks About Being the Man in Charge

By Liz Spikol

Posted May. 4, 2011 | Comments: 0 | ↻Add Comment

Share this Story:     Tweet!

**What were your impressions of Philadelphia journalism before you got involved with it?**

Let me first focus my response on *PW* and its predecessor, the *Welcomat* (which became *Philadelphia Weekly* in 1995). I came to Philadelphia in 1982. Candidly, when I got the *Welcomat* free on my doorstep, it would invariably go straight into the trash. This was because the covers nearly always failed to grab my attention and so, for me personally, all the hard work and good writing—and it was usually quite good—that went into putting each edition together was a waste. In 1981, Dan Rottenberg became the paper's first editor since its launch in 1971. Over time, Dan developed a following of local readers until he chose to move on in 1993. He focused quite a lot of editorial content on the "little guys" around town whose diverse range of activities, accomplishments, views and personas were of local interest (but did not much interest the two local dailies) and, he felt, needed a voice. While this was good for a certain limited circle of readers, it did not serve as a base on which to build a wider audience and to garner the support needed from local, regional and national advertisers that would make the growing paper self-sustaining.

On my watch, we chose to focus much more on trying to create a seductive cover each week as the 'key to the door' for readers to open ... to each edition chock full of interest. At first, this notion did not sit well with some editorial folks who focused almost exclusively on writing text but ignored the critical importance to the reader of artful artwork that would draw them into a story. This remains a challenge at times, as successive generations of art directors put their individual artistic hallmarks on the covers and inside each edition.

We also deliberately increased the size of the news hole space and reduced the amount of advertising pages in order to attract more readership. The format changed to more of what it is today—a free weekly paper focused on younger urban adults, where they want to live, what they want to do and where they want to go. It so happens that this readership focus also resonates with advertisers desiring to reach those who are still young and independent enough to be making their consumer brand choices for life. In turn, this has helped nourish the paper's growth over time.

Journalism 'proper' was still largely the preserve of the dailies and then-[*Inquirer*] Editor Eugene Roberts. Under his leadership, the dailies won a series of Pulitzer Prizes. The dailies were then local 'supermarkets' or 'department stores' of some local, and much regional, national and international news but whose readership tended toward an aging readership of 55 plus. By contrast, our focus was 'local, local, local' with

emphasis on younger folk in their 20s to 40s and interested in local arts, entertainment and local topics that would rarely see the light of day in the two dailies.

**How have you seen PW change over the years?**

In addition to changes mentioned above, *PW* has long since converted many tedious manual processes to automation— all the way from typing copy on a typewriter and typesetting it to pasting it up with wax, to its business systems. This is because I've always firmly believed in consigning repetitive and relatively mindless tasks to reliable robots (aka computer systems) and freeing up smart people to do smart things that computer systems can't do. Taking advantage of technology has been key to our survival and success. It has helped us free up the creative talent that resides in the majority of people on our *PW* team.

This is an inexorable and critical process as technology gets better and cheaper. At the same time, you can have the best computer system in the world, but if you have weak people performing, then there's nowhere to go. So we try very hard to find and hire the best talent we can and to show respect to the people on our team, because they are the ultimate ambassadors of the paper on whom we depend to link it to both its readers and its advertisers.

**What is the most important thing you want to commemorate for this anniversary?**

The people who make our paper and create our website and other digital products are first and foremost those I want to recognize on this significant anniversary. As to commemoration proper, I'd like to salute all those who have struggled through a succession of tough recessions and real-estate and financial system meltdowns that have, at times, greatly challenged our business. At the end of the day, our business is a people business where creative and gifted individuals work together to help to create something bigger than themselves alone and to share the fruit of their efforts with a really large and growing audience.

**How do you feel about the future of print media?**

In two words, very excited. I refuse to buy the argument that 'newspapers are dead'. That is a complete red herring. The newspaper is simply one type of vehicle for conveying what readers really want, which is accurate and timely information. The Internet and tablets and mobile phones are clearly here to stay, so neither we nor our readers need ever feel imprisoned by the 'four walls' of the newspaper whose capacities and physical size is limited and finite. Readers can potentially get the accurate information they need right now. So there are only two things to limit our ability going forward—our creative imagination and our resources to realize it.

**Find this article at:**
http://www.philadelphiaweekly.com/news-and-opinion/Anthony-Clifton-Talks-About-Being-the-Man-in-Charge.html?printView=y

☐ Check the box to include the list of links referenced in the article.

Copyright © Review Publishing

# EXHIBIT G

EEOC Form 161-B (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:   Tara Murtha<br>C/O J. Conor Corcoran, Esq.<br>1617 John F. Kennedy Boulevard, Suite 1130<br>Philadelphia, PA 19103 | From:   **Philadelphia District Office<br>801 Market Street<br>Suite 1300<br>Philadelphia, PA 19107** |

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **530-2013-01359** | **Legal Unit** | **(215) 440-2828** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐   More than 180 days have passed since the filing of this charge.

☒   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒   The EEOC is terminating its processing of this charge.

☐   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

**Spencer H. Lewis, Jr.<br>District Director**

6/25/13
*(Date Mailed)*

cc:
Anthony A. Clifton
President
PHILADELPHIA WEEKLY
1500 Sansom Street
Suite 300
Philadelphia, PA 19102

Conor Corcoran
One Penn Center at Surburban Station
1617 John F. Kennedy Blvd., Suite 1130
Philadelphia, PA 19103

# EXHIBIT H

**Subject:** ironic intro to Review Publishing handbook

**From:** Tara Murtha (̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶.com)

**To:** conorcorcoran@yahoo.com;

**Date:** Wednesday, May 2, 2012 8:43 PM

# WELCOME TO REVIEW PUBLISHING LIMITED PARTNERSHIP!

Starting a new job is exciting, but at times it can be overwhelming. This Employee Handbook has been developed to help you get acquainted and answer many of your initial questions.

As an employee of Review Publishing Limited Partnership ("Review Publishing" or "the Partnership"), you have many opportunities to make positive individual contributions to the Partnership. Our purpose for being -- that is, our mission -- at Review Publishing is to be the best possible information provider of our kind. We do this by bringing our target groups of readers and advertisers together effectively through our printed and electronic media, with the brightest employees possible and in an atmosphere of mutual respect and trust between our readers, our advertisers, our vendors and all of our employees.

Our goal for READERS is to offer them the most compelling sources possible for the entertainment and other information that we know they desire. Our goal for ADVERTISERS is to produce results -- which means, the highest possible response rates to their advertisements in our media. If we can help our advertisers grow their businesses successfully, they can help us grow ours; and so, we can all benefit. By satisfying our advertisers' and readers' needs, we believe they will continue to do business with us and also will recommend us to others. YOU are a vital part of this process because your work directly influences our Partnership's reputation.

This Employee Handbook explains our personnel policies and benefits, as well as specific responsibilities and the opportunities that exist for you within our Partnership. We are committed to providing the best possible climate for maximum development and achievement of goals for all employees. At Review Publishing, we seek to develop a spirit of teamwork -- individuals working together to attain a common goal.

In order to maintain an atmosphere where our mission and goals can be accomplished effectively, we have provided a workplace that we try to make comfortable and progressive. Most importantly, we have a workplace where communications are open and problems can be discussed and resolved in a mutually respectful atmosphere, taking into account individual circumstances and the individual employee. We firmly believe that by communicating openly, respectfully and directly with each other, we can continue to resolve any difficulties that may arise and develop a mutually beneficial relationship.

We are glad you have joined our team and hope you will find your work both challenging and rewarding.. If you have any questions about the contents of this Handbook, please contact your supervisor, your Publisher or me.

Sincerely,

Anthony A. Clifton President

**Subject:** handbook excerpts

**From:** Tara Murtha (~~~~~~~~.com)

**To:** conorcorcoran@yahoo.com;

**Date:** Wednesday, May 2, 2012 8:53 PM

## *EQUAL EMPLOYMENT OPPORTUNITY POLICY*

Review Publishing will not unlawfully discriminate based upon race, creed, color, sex, pregnancy, national origin, ethnicity or ancestry, religion, age, disability, citizenship, marital status, affectional or sexual orientation, military or veteran status, or any other prohibited basis. This commitment applies to all aspects of the employment relationship, including hiring, promotion, compensation, discipline, discharge, and any term or condition of employment. All employment decisions will be made and all personnel policies construed in compliance with all applicable federal, state, and local anti- discrimination laws. All unlawful discrimination is prohibited.

In addition, Review Publishing will make reasonable accommodations for qualified individuals with disabilities known to the Partnership. The Partnership also will make reasonable accommodations to the religious beliefs and practices of its employees of which it is aware. The Partnership, however, need not make any accommodation that would place upon it an undue hardship or burden.

## *POLICY AGAINST HARASSMENT*

Review Publishing will not tolerate any form of impermissible harassment. Included in this prohibition are sexual harassment, racial harassment, national origin harassment and harassment based upon ancestry, ethnicity, pregnancy, color, religion, age, disability, citizenship, marital status, affectional or sexual orientation, military or veteran status, or any other prohibited basis.

Sexual harassment includes unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature if:

- Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or

- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

    Racial harassment and national origin harassment include any verbal, symbolic, or physical behavior that stigmatizes, insults, victimizes, or persecutes an individual based upon race or national origin. Other forms of prohibited harassment, although not discussed at length in this Policy, are equally prohibited.

    The prohibitions of harassment and discrimination in this Policy also apply to the actions of non- employees (such as vendors, customers, etc.) if such actions relate to you and your employment. If you believe you have been subject to harassment or discrimination by a non-employee in connection with your employment, you should use the complaint procedures which are described in the final section of this Policy. Finally, any conduct by you that would be prohibited because it might offend other employees is also prohibited if carried out in a manner that might offend non-employees with whom you come into contact during the course of your employment.

## SANCTIONS FOR VIOLATIONS OF THIS POLICY

Any person who the Partnership concludes has engaged in impermissible discrimination or harassment in violation of this Policy will be subject to the appropriate corrective action up to and including discharge.

Any person who the Partnership concludes has harassed, retaliated against, threatened or otherwise coerced any person for making a complaint or report under this Policy, or for supporting or providing information during the investigation of a complaint or report, will be subject to the appropriate corrective action, up to and including discharge.

The conduct warranting discipline or discharge need not constitute unlawful activity, if the Partnership concludes such conduct is contrary to the best interests of the organization.

## IF YOU BELIEVE THAT YOU HAVE BEEN SUBJECTED TO DISCRIMINATION OR HARASSMENT

If you believe that you have been subjected to discrimination or harassment in violation of this Policy, or if you find certain conduct to be offensive but are unsure as to whether such conduct constitutes a violation of this Policy, Review Publishing Limited Partnership urges you, in all cases, to report promptly to your Publisher, to any Vice President of Review Publishing or to the Partnership's President your concerns.

If you wish to attempt to resolve a problem directly with the individual engaging in the offensive conduct, you may approach her/him directly and tell the individual that the behavior is unwelcome and should stop. You also may contact directly the individual's supervisor. However, you are **NEITHER EXPECTED NOR REQUIRED** to approach directly and on your own the individual or the individual's supervisor -- you **ALWAYS** may approach your Publisher, any Vice President of Review Publishing or the Partnership's President. If you do approach the individual directly and are not fully satisfied with her/his response, you are urged to contact your Publisher, any Vice President of Review Publishing or the Partnership's President.

All complaints of alleged improper discrimination or harassment made to your Publisher, any Vice President of Review Publishing or the Partnership's President will be investigated. The existence and nature of your complaint or report will be disclosed only to the extent necessary to conduct an effective investigation and/or to take the appropriate remedial action.

There will be absolutely no retaliation directed against any person who makes a complaint or report under this Policy, supports a complaint or report under this Policy, provides information (including acting as a witness) concerning any complaint or report under this Policy, or otherwise properly opposes prohibited discrimination or harassment in Review Publishing's workplace. Any such retaliation is contrary to the Partnership's policy and will not be tolerated. If you believe that you are being subject to such retaliation, you should report your concerns to your Publisher, to any Vice President of Review Publishing or to the Partnership's President.

## PERFORMANCE REVIEWS

During your first weeks of employment, your supervisor will discuss and set with you appropriate benchmarks for measuring your work performance. These benchmarks, which are described as Performance Standards and are included in your Job Description, are both qualitative and quantitative. Periodically, your supervisor will review informally with you your success in achieving these benchmarks.

9/1/2006 11

Generally, your job performance is reviewed formally at least once each year, either during the anniversary month of your joining the Partnership or on the anniversary date of your most recent promotion. The purpose for this formal Performance Review is to promote an open, clear and mutual understanding between you, your supervisor, your Publisher and the President of the Partnership relative to your observed past performance and future professional development.

As part of this formal Performance Review, your supervisor will ask you to complete a self review. Part of the self-review asks you to rate yourself against the performance-related benchmarks that you and your supervisor had established previously. Your supervisor will consider your self-review and discuss with you her/his assessment of your performance. The completed Performance Review will highlight your professional and personal strengths and weaknesses, describe a plan outlining the steps recommended for skill development, and include new benchmarks for the upcoming review period.

**In addition to functioning as a tool whereby you, your supervisor and the Partnership's management team reach a common understanding about your performance, the Performance Review is an element of the Partnership's process for determining possible periodic changes to your compensation. Additional factors which impact adjustments to compensation include, most importantly, the quality of your overall record of performance and conduct as well as the Partnership's financial condition and its ability to compete successfully for advertisers and in the employment market.**

## *EXPENSE REIMBURSEMENT*

All ordinary and necessary business-related expenditures on behalf of Partnership should be approved by the employee's supervisor before being expended. Any business travel and related expenses for management require the President's approval and must be documented for tax purposes by an expense report containing accurate and detailed information concerning the:

- Purpose of meeting;

- Identity of and relationship to Review Publishing of those attending the meeting; and

- Expenses incurred along with original receipts.

  This information is important because Review Publishing must meet the standards of reporting as required by the Internal Revenue Service.

9/1/2006 43

Please note that, if you use your personal vehicle on Partnership business and you incur a traffic ticket, moving violation or fine/towing charge for illegal parking, you personally are responsible for such ticket/fine. The Partnership DOES NOT reimburse these types of expenses.

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **Tara Murtha** | : | |
| **1617 John F. Kennedy Boulevard** | : | |
| **Suite 1130** | : | |
| **Philadelphia, PA 19103,** | : | |
| | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | **No.** |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **Review Publishing Limited Partnership** | : | |
| **d/b/a Philadelphia Weekly** | : | |
| **1500 Sansom Street, 3rd Floor** | : | |
| **Philadelphia, PA 19102** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Sural Corporation** | : | |
| **One Belmont Avenue** | : | |
| **Bala Cynwyd, PA 19004** | : | |
| | : | |
| **and** | : | |
| | : | |
| **Anthony and Catherine Clifton,** | : | |
| **aka Catherine Roberts, H/W,** | : | |
| **d/b/a Philadelphia Weekly** | : | |
| **1500 Sansom Street, 3rd Floor** | : | |
| **Philadelphia, PA 19102** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

## CERTIFICATE OF SERVICE

I, J. Conor Corcoran, Esquire, hereby certify that a true and correct copy of the Complaint in the above captioned matter has been sent to the following by first class, United States, certified mail:

**Review Publishing Limited Partnership**
1500 Sansom Street, 3rd Floor
Philadelphia, PA 19102

11

VIA FIRST CLASS MAIL
AND FAX: 215-563-7778
AND EMAIL: aclifton@reviewpublishing.com

Sural Corporation
One Belmont Avenue
Bala Cynwyd, PA 19004
VIA FIRST CLASS MAIL

Respectfully Submitted,

Date:  July 31, 2013

J. Conor Corcoran, Esquire
Atty. I.D. No. 89111
1617 John F. Kennedy Boulevard
Suite 1130
Philadelphia, PA 19103
Phone: (215) 977-9300
Fax: (215) 864-0188

12